(No. 69727

SUBURBAN BANK OF HOFFMAN-SCHAUMBURG, Appellant, v. CHRISOULA BOUSIS, Appellee.

*Opinion filed May 30, 1991.—Rehearing denied September 30, 1991.*

CALVO and BILANDIC, JJ., took no part.

Riordan, Larson, Bruckert & Moore (Richard J. Riordan, Robert Keith Larson and Brian W. Norkett, of counsel), and Chadwell & Kayser, Ltd. (Champ W. Davis, Jr., of counsel), all of Chicago, for appellant.

Regas, Frezados & Harp, of Chicago (Peter L. Regas and R. Kymn Harp), for appellee.

CHIEF JUSTICE MILLER delivered the opinion of the court:

The plaintiff, Suburban Bank of Hoffman-Schaumburg, brought an action in the circuit court of Cook County against Chrisoula Bousis and others seeking to have Chrisoula's name removed as the legal owner of a

savings account held at the bank. Following a bench trial, the trial judge reformed the savings account contract to what was termed in the decree "an escrow or a trust account" for the benefit of Chrisoula's father, George Bousis. In an unpublished order, the appellate court reversed the judgment of the circuit court. (188 Ill. App. 3d 1109 (order under Supreme Court Rule 23).) We allowed Suburban Bank's petition for leave to appeal (134 Ill. 2d 315(a)), and we now affirm the judgment of the appellate court.

The facts in this matter are largely undisputed. In two separate transactions, in 1975 and 1976, Suburban Bank of Hoffman-Schaumburg (the bank) lent George Bousis and his brothers money to renovate a restaurant they owned and operated. The loans were evidenced by promissory notes in the amounts of $70,603.80 and $15,000 respectively. Both notes were secured by the assignment of the beneficial interest in the Illinois land trust that held title to the parcel of real estate on which the restaurant was located. The brothers later defaulted on the promissory notes.

On several occasions, the bank's president, Glen Short, and the Bousises' attorney, Conrad Verges, discussed working out the defaulted loans. In November 1979, George's adult children, Chrisoula and Gus Bousis, began negotiations for the purchase of the bank's position in the two loans. Chrisoula and Gus were contemplating the purchase of the property, and with it the bank's interest in the promissory notes. Purchase of the bank's position in the two promissory notes would cost about $90,000.

On November 13, 1979, Chrisoula met Short in his office at the bank to discuss the transaction. Also present at the meeting were Conrad Verges, as attorney for Chrisoula and Gus, and George Bousis, their father. Chrisoula indicated that she and her brother had suffi-

cient funds to purchase the bank's position. Chrisoula produced account passbooks from other financial institutions as evidence of $44,000 in liquid assets. She then removed from her purse two cashier's checks totaling $46,287.18. The first check was for $7,600; it was issued by the Devon Bank to the order of George Bousis. The second check was for $38,687.18; it was issued by the National Bank of Greece, Argos Branch, to the order of George Bousis or Maria Bousis. Short suggested that the cashier's checks be deposited in a savings account at the bank until the purchase was completed.

Chrisoula handed the cashier's checks to attorney Verges, who noticed that they were made payable to George. Verges then gave the checks to George, who endorsed them in blank. At the hearing, Chrisoula testified that her father, speaking in Greek, sought her assurance that the funds would not be applied to his debt. According to Chrisoula, attorney Verges repeated the question to Short, and the bank president explained that the checks would be deposited in a savings account in Chrisoula's name and that she would be the only person allowed to withdraw the funds. The record does not disclose whether Short's answer was translated for George, who spoke little English. During his testimony, Short stated that he could not recall what was said at the time. Short testified, however, that he did remember that George handed him the endorsed checks for deposit in Chrisoula's account.

Short immediately opened a regular savings account for Chrisoula, personally executing the paper work establishing the account. Short gave Chrisoula a signature card, which she alone signed. Chrisoula received a deposit slip confirming an initial deposit of $46,287.18 to her account and a booklet of deposit slips to be used for future deposits. Finally, Short handed Chrisoula a copy of the bank's rules and regulations governing savings ac-

counts. The parties agreed that Chrisoula would return four days later, on November 17, with the money needed to complete the purchase of the bank's interest in the delinquent promissory notes.

Early on November 17, Chrisoula informed Short, by telephone, that she and her brother had decided against buying the property held in the land trust and therefore did not wish to purchase the bank's interest in the two promissory notes. Immediately following that conversation, Short ordered the $46,287.18 withdrawn from Chrisoula's account. The funds were then placed in a segregated account controlled by the bank. At the hearing, Short explained that he took that action because he believed that the money belonged to George and was intended to cure George's indebtedness. Chrisoula later attempted to withdraw the funds several times, but on each occasion she was told that her account balance was zero.

The present action began as a suit by the bank to foreclose on the assignment of beneficial interest in the land trust, which served as collateral for the two promissory notes. Named as defendants were George, his brothers, Chrisoula, and other interested parties. In its second-amended complaint, the bank sought either reformation or rescission of the savings account agreement. The bank alleged that the account contract was never intended to constitute a statement of the parties' entire agreement. The bank asserted that the savings account was created in Chrisoula's name solely for the purpose of holding George's money until the daughter could return with the balance of the purchase price and complete the transaction. The complaint asked the court to reform the savings account contract to limit the use of the account proceeds to either the completion of the original purchase agreement or as collateral for the payment of George's debt. Alternatively, the bank asked "that the

savings account be cancelled and held for nought and that the sum of $46,287.18 received from George Bousis be applied to the indebtedness due and owing by George Bousis to the bank."

In response to the bank's initial complaint, Chrisoula filed a six-count counterclaim seeking return of the funds deposited in her account. Chrisoula asserted, among other things, that the bank breached the savings account contract when it withdrew the funds from her account and then withheld the funds from her. By way of affirmative defense to Chrisoula's claim, the bank contended that Chrisoula was equitably estopped from. asserting ownership of the funds in the savings account. The bank argued that it would be prejudiced and Chrisoula unjustly enriched if she were allowed to claim ownership of funds deposited to her savings account, by another, for the sole purpose of completing the underlying transaction.

Chrisoula later moved for summary judgment on her counterclaim. The trial judge granted the motion, rejecting the bank's contention that parol evidence would be admissible to alter the terms of the savings contract. On the bank's appeal from that judgment, the appellate court reversed. The appellate court agreed with the bank's contention that parol evidence could be admitted here in support of the bank's theory. In that appeal, the appellate court remanded the cause for a joint trial on the complaint and counterclaim. 116 Ill. App. 3d 1173 (unpublished order under Supreme Court Rule 23).

On remand, following an evidentiary hearing, the trial judge found that the savings account contract did not govern the account because "the account was set up for the sole purpose of serving a larger transaction or agreement pursuant to which the bank's notes and collateral were to be purchased." The trial judge removed Chrisoula as legal owner of the account and, though not

specifically requested to do so by the bank in its pleadings, reformed the account contract to reflect an "escrow or trust account" for the benefit of Chrisoula's father, George. The bank later sued itself as fiduciary for George, and the same judge entered a decree authorizing the bank to garnish the newly created trust account in satisfaction of the defaulted loans. Chrisoula appealed from the judgment reforming the savings account contract.

In an unpublished order, the appellate court reversed. (188 Ill. App. 3d 1109 (order under Supreme Court Rule 23).) The appellate court concluded that the trial judge's findings were against the manifest weight of the evidence, and held that the bank was bound by the terms of its savings account contract with Chrisoula. The appellate court believed that the testimony presented by the bank at trial was not sufficient to overcome the bank president's actions in establishing this type of account. The court reasoned that the bank president had all the means at his disposal to effectuate a result that would have limited Chrisoula's access to the account proceeds but chose instead a routine savings account in her name alone. Noting that George had not asserted an equitable claim to the account proceeds, the appellate court believed that George's status as the source of the funds was irrelevant in determining whether the account contract between the bank and Chrisoula should be enforced. The appellate court judgment reestablished Chrisoula as the legal owner and controller of the account and stripped the bank of its trustee status. We allowed the bank's petition for leave to appeal (134 Ill. 2d R. 315(a)).

It is undisputed that the only written agreement signed by the parties was the savings account contract, and the parties do not deny that the agreement established a contractual relationship between them. It is also

clear that the corpus of the savings account consisted of the cashier's checks made payable to the order of George Bousis, and that the checks were endorsed in blank and deposited, with George's consent, in the account. The parties do not agree on whether the savings account contract accurately reflects the parties' agreement and whether the provisions of the account contract must be enforced.

The bank maintains that the trial court correctly determined that the savings account contract did not govern the distribution of the $46,287.18 deposited in the account. In support of this contention, the bank asserts that the account was intended to serve only as a temporary receptacle for the funds until the purchase of the bank's position in the defaulted promissory notes could be completed. In this regard, the bank submits that the documentation establishing Chrisoula as legal owner of the account should not be enforced because it does not reflect the parties' agreement for the distribution of the money on deposit. Chrisoula argues that the savings account contract clearly established her legal interest in the account and, furthermore, that the contract may not be set aside merely because it might fail to represent the bank president's understanding of the purpose of the account.

A written contract may be reformed to reflect the intention of the parties and the agreement between them. This court has stated:

"An action to reform a written agreement rests upon a theory that the parties came to an understanding, but in reducing it to writing, through mutual mistake, or through mistake of one side and fraud on the other, some provision agreed upon was omitted, and the action is to so change the instrument as written as to conform it to the contract agreed upon, by inserting the provisions omitted or striking out the one inserted by mutual mis-

take." (*Harley v. Magnolia Petroleum Co.* (1941), 378 Ill. 19, 28.)

It is assumed that the parties' written agreement expresses their mutual intentions, and this conclusion will not yield to any other unless the contrary evidence is clear and convincing. (*Harley*, 378 Ill. at 27.) For the reasons set out below, we conclude that the bank, having been allowed to introduce parol evidence in support of its claim, failed to present clear and convincing proof that the account contract should be reformed.

The bank failed to show that the agreement between the parties was intended to include language limiting the use of the account proceeds, nor did the bank show that by mutual mistake this language was not included in the account contract. The evidence clearly establishes that the parties intended for the account contract, as written, to apply to the funds on deposit. The bank's intention to open a routine savings account was confirmed when bank president Short testified at trial that the savings account "was strictly my idea." In light of that testimony, we note that Short chose to establish a routine savings account in Chrisoula's name alone, though he could have instead established a custodial account, a trust account, or an escrow account to memorialize a different understanding for the control of the funds. It may be noted that the two promissory notes granted the bank a right of set-off or lien against deposits made by its borrowers. (See also *Gluth Brothers Construction, Inc. v. Union National Bank* (1988), 166 Ill. App. 3d 18.) The bank supplied the savings account contract to its depositor, and thus was not in any respect at a disadvantage or on unequal footing when it entered into the agreement with Chrisoula. If Short had believed that the funds were intended to reduce George's liability on the notes, the bank could have accepted the funds and applied them directly to the debts.

Equity cannot make a new agreement for the parties under the color of reforming the one made by them, nor can it be used to add a provision to the contract that was never agreed upon. (*Harley*, 378 Ill. at 28.) In the present case, there is no written instrument other than the savings account contract expressing the parties' agreement over the eventual disposition of the $46,287.18 deposited in the account. At the close of the November 13 meeting, it was the intention of the parties to proceed with the planned transfer of the bank's interest to Chrisoula and Gus. But the only enforceable contract then existing was that of the savings account established that day by Chrisoula at the bank. At that point the parties had decided on a certain course of action, and opening the account was one step in that process. There was nothing, however, to prevent the prospective purchasers from changing their minds, as they eventually did. (See *Quake Construction, Inc. v. American Airlines, Inc.* (1990), 141 Ill. 2d 281, 312 (Stamos, J., specially concurring).) Although the account contract did not reflect an understanding of the larger agreement, the evidence shows that the contract did accurately reflect the parties' mutual agreement for the placement of the funds. The account contract, signed by Chrisoula and initialed by Short on behalf of the bank, was unambiguous. In the absence of clear and convincing evidence that the contract did not reflect the parties' understanding that the funds would be placed in a savings account to be controlled by Chrisoula, the court has no legal basis to support judicial reformation of the contract. *Wishnoff v. Guardian Savings & Loan Association* (1975), 34 Ill. App. 3d 107, 110.

As additional support of its theory that the terms of the savings account agreement do not control the present case, the bank contends that the contract should not be enforced because Chrisoula is not the equitable

owner of the account. At the evidentiary hearing, the bank was allowed to introduce parol evidence of the November 13 meeting to support its claim that Chrisoula had no interest in the account because her father, George, was the source of the account proceeds. The bank relies on *In re Estate of Muhammad* (1984), 123 Ill. App. 3d 756, *appeal after remand* (1987), 165 Ill. App. 3d 890, for the proposition that a court may determine equitable ownership of funds in an account to lie in one other than the person who is the designated legal owner of the account.

*Muhammad* involved a contest for control of the proceeds of a bank account between the Muhammad family, as legal owner of the account, and a religious organization, as the alleged equitable owner of the account. The contested account contained only donations solicited by the religious organization for charitable purposes. Noting that contributions to individuals, "no matter how worthy," do not qualify for charitable deduction, the appellate court in that case determined that the legal owners of the account would be unjustly enriched if they were allowed to retain funds raised by the charitable organization and donated with tax deductible status. (*Muhammad*, 165 Ill. App. 3d at 897.) A constructive trust was imposed on behalf of the religious group by whom, and for whose benefit, the funds were raised.

We do not agree with the bank's contention that the principles expressed in *Muhammad* are applicable here. There is no evidence in the present record to suggest that Chrisoula will be unjustly enriched if she is allowed to retain control over the money in her savings account. Unlike the situation in *Muhammad*, in the case at bar Chrisoula alone claims the account proceeds. At no point in the proceedings has George asserted an interest in the savings account. In fact, George's actions are indicative of an intent to relinquish to Chrisoula all present and fu-

ture dominion and control over the funds deposited; George endorsed the checks and presented them to Short with the understanding that the proceeds would be placed in a savings account owned solely by his daughter. These actions are consistent with Chrisoula's contention that the funds were a gift, and, without a challenge from George, no other inference should be drawn. (See *Christian v. Christian* (1979), 69 Ill. App. 3d 450.) Thus, there is no evidence in the present case that, by honoring Chrisoula's claims to the account proceeds, the bank would have been "deal[ing] with the account's contractual owner to the detriment of the equitable owner." *Muhammad*, 123 Ill. App. 3d at 759.

A bank-depositor/debtor-creditor relationship arises from and is regulated by contract, rather than by the ownership of the funds. (See *Landretto v. First Trust & Savings Bank* (1928), 333 Ill. 442, 448-49.) The savings account contract executed by the bank and Chrisoula sets forth the rules governing their relationship. (See *Susen v. Citizens Bank & Trust Co.* (1982), 111 Ill. App. 3d 909, 913.) The contractual agreement between the bank and Chrisoula integrated several documents, including a signed signature card, the deposit slips for the account, the receipt for the initial deposit, and a copy of the rules and regulations governing the account.

In the contract signed by the parties in this case, section 1 of the governing rules and regulations, entitled "Deposits," provided, "At the time of making the initial deposit in a Savings Account, the depositor shall be required to sign a signature card \*\*\*." In conformity with this rule, Short prepared a signature card, which was signed by Chrisoula and initialed by Short on behalf of the bank. Printed on the signature card was standard language common to other savings accounts held at the bank. The signature card stated, "Each person whose signature appears above hereby agrees that all deposits

made to this account shall be handled by this bank in accordance with its rules and regulations with reference to savings accounts as they may from time to time be amended." Accordingly, the bank's own rules and regulations governed the account and provided Chrisoula as the account's sole depositor.

Consistent with standard banking practices, section 2 of the account rules and regulations, pertaining to withdrawals, provided, "Withdrawals of amounts due on a Savings Account may be made only on the written order or receipt of the depositor, or his authorized agent, legal representative, successor or assign ***." (See *Sanders v. Merchants State Bank* (1932), 349 Ill. 547, 563-64.) The bank, therefore, could not make payments from Chrisoula's account, or charge such payments to her account, in the absence of an order from Chrisoula. (See *National Bank of the Republic v. Young* (1905), 125 Ill. App. 139, 142.) And, even if the account were established for the special purpose of holding the funds until the contemplated purchase was completed, as the bank suggests, the bank would be required to return the money to Chrisoula upon demand because the account agreement signed by both parties governed the distribution of the funds. As the only depositor named on the signature card, Chrisoula was the sole legal owner of the account, and she alone had an absolute and unconditional right to possession of the account proceeds (see *Katz v. Belmont National Bank* (1986), 112 Ill. 2d 64, 69), in the absence of a countervailing equitable claim. We conclude that the bank deviated from the terms of the contract when it withdrew the funds in Chrisoula's account without her consent.

In general, great weight is attached to the trial judge's factual findings. A reviewing court may, however, reverse a decree where, from a consideration of the entire record, it appears that the fact finder's deter-

minations are against the manifest weight of the evidence. (*Greathouse v. Vosburgh* (1960), 19 Ill. 2d 555, 568.) Having examined the record as a whole, we conclude, for the reasons set out above, that the trial judge's reformation of the account contract to "an escrow or trust account" is against the manifest weight of the evidence. The bank did not present a legal or equitable theory that would warrant breaching the account contract and ignoring standard banking practices. The disposition of the account proceeds must, therefore, be governed by the savings account contract.

For the reasons stated, the judgment of the appellate court is affirmed.

*Judgment affirmed.*

JUSTICES CALVO and BILANDIC took no part in the consideration or decision of this case.